In the Interest of E.V. and I.S.V., Jr., Children

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-210-CV

IN THE INTEREST OF E.V. 

AND I.S.V., JR., CHILDREN 

------------

FROM THE 393
RD
 DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Sarah G. appeals from the trial court’s termination of her parental rights to her children, E.V. and I.S.V., Jr.  In six points, she challenges the legal and factual sufficiency of the evidence to support the trial court’s findings on endangerment and failure to support.  Because we hold that the evidence is legally and factually sufficient to support the termination of Sarah’s parental rights, we affirm the trial court’s order of termination and adoption. In November 1999, Sarah apparently voluntarily placed the children with her mother, Lynn H., who was and is married to Jim C.  In December, Lynn filed a petition to modify the parent-child relationship, seeking conservatorship of the children.  On November 1, 2000, Lynn and Jim filed a petition for termination and adoption of the children.  On November 28, 2000, Lynn was named sole managing conservator of the children, and the trial court ordered that the parents have no visitation rights with the children.  The causes were later consolidated.  The trial court terminated Sarah’s parental rights on April 2, 2004 after a four-day bench trial.  The father voluntarily relinquished his rights.  The trial court signed the order of adoption and termination on June 2, 2004.

The petition for termination alleged, and the trial court found, that Sarah knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, and failed to support the children in accordance with her ability during a period of one year ending within six months of the filing of the petition for termination.
(footnote: 2)  The trial court also found that termination was in the children’s best interest.
(footnote: 3)
 In six issues that she briefed together, Sarah argues that the evidence is legally and factually insufficient to support the trial court’s findings on endangerment and failure to support.

As this court explained in 
In re W.J.H.
,

Endangerment means to expose to loss or injury, to jeopardize.  It can occur through both acts and omissions.  Neglect can be just as dangerous to the child’s emotional and physical health as intentional abuse.

Under subsection D [of the termination statute], evidence must show that the child’s environment is a source of endangerment.  In some circumstances, the parent’s conduct may create that dangerous environment.  Subsection E focuses on the parent’s conduct alone, including acts and omissions.  While the endangerment must be a direct result of the parent’s course of conduct, the conduct does not have to be directed toward the child, nor does the child have to suffer actual injury for the finding to be upheld.  Similarly, the conduct does not have to cause a concrete threat of injury to the child.  If the evidence shows that the parent has engaged in a course of conduct which has the effect of endangering the child, then the finding under subsection E may be upheld.
(footnote: 4)

Similarly, this court has also explained,

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.  Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct.  Further, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child.  Threats or attempts to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being.
(footnote: 5)
 The trial court admitted the following evidence.  On Sunday, October 31, 1999, Sarah’s grandmother called Jim and voiced concerns about Sarah.  He went to Sarah’s apartment to check on her.  He found the door wide open.  Sarah was incoherent.  I.S.V., Jr., who was one year old at the time, was asleep in his crib, and his older sister E.V., who was two and one-half years old, was watching television.  Jim saw bottles of pills lying on the breakfast bar, and he testified that the pills were within reach of the children.  Several days later, Sarah attempted to commit suicide.  Within two days, she tried again.  Although the children were still in her legal custody at the time of both attempts, there is no evidence that they were physically present when Sarah tried to kill herself.  Sarah testified that she told doctors that she had tried to kill herself because she was “in an abusive relationship with [her] children’s father, and either he was going to kill [her] or [she] was going to kill [herself].” 

Jim testified that Sarah had told him that the children’s father was a drug dealer.  Jim also testified that Sarah had told him that the father had assaulted her in the parking lot of her apartment complex while she was holding the baby, I.S.V., Jr.  Another witness testisfied that the father had beaten Sarah pretty badly at a motel.  Sarah testified that the children’s father had assaulted her numerous times, both before and after the children were born, and that she went to the hospital as a result of several of the assaults.  He had gone to jail or prison for four of the assaults.

Sarah testified that she had lived in Kansas for about a year prior to trial. She was not employed at the time of trial.  She had had sporadic employment, with her most recent employment, from December 2003 until January 2004, netting her $420.  She planned to begin a certified nurse aide course in Kansas after trial.  Although the trial court had ordered that Sarah pay child support of $177 per month, she did not pay any in 2004 and only $25 in 2003, and that was in August.  Sarah testified that she had not paid for any of the children’s medical expenses since 1999.  On the other hand, she paid the expert witness $700, according to her testimony, and $1,075, according to his.  Sarah sent the children cards and some clothes during the years that she was not allowed to visit.

Sarah’s paternal grandmother helped support her.  Sarah testified that since 1999, her grandmother had provided her with a car to drive, a place to live, and a big screen television, but her grandmother would not give her money to support the children.

By the time of trial, Sarah testified, she had been arrested four times, three times for theft and once for possession of drugs.  She also admitted to having a pending theft charge in Baxter Springs, Kansas, but she denied that she had been arrested there.  In March 2001, Sarah pled guilty to the possession of a controlled substance by fraud and received two years’ probation.  In 2002, she acted as a drug informant to attempt to get off probation early so that she could move to Kansas.

Sarah testified that she was a recovering addict, that she was addicted to painkillers, hydrocodone, and Xanax, and that Xanax, which had been prescribed for her, had been her drug of choice when she first became addicted. She also testified that she had lied to Denton County MHMR personnel after her second suicide attempt when she told them that she did not have a drug problem.

Sarah said that her recovery began in March 2001 when she began her probation, but she admitted that she continued to associate with people whom she had done drugs with even after that time.  She also claimed that she was in treatment for her drug problem at Tulsa Rightway, 120 miles from her home in Kansas, and that she had been going there for about a year.  She testified that she saw a counselor, Rebecca Hall, once a week and attended group counseling.  She also testified that she paid $130 per month for that treatment. Sarah did not know what Hall’s credentials were.  Sarah did not provide documents regarding her treatment for substance abuse in Oklahoma or her prior drug treatment at clinics in Denton and St. Louis.  Sarah claimed that she was in a twelve-step program and had been during her entire recovery, but she could not name any of the steps and could not explain which step she was working on.  At one point, her therapist was listed as a witness, but Sarah chose not to call her.  Sarah also chose not to call her grandmother as a witness.

Sarah's urine and hair follicle drug tests that the trial court ordered during the trial came back negative for drugs, but they also came back negative for methadone, which Sarah insisted that she took daily as prescribed as part of her drug treatment.  She had no explanation for the negative test for methadone.

When the children began living with Jim and Lynn in November 1999, E.V. had night terrors every night for about a year and frequent bedwetting.  She was also terrified of strangers, the dogs that she had previously enjoyed playing with, and visits from the Tooth Fairy or Santa Claus.  Sarah had made threatening telephone calls to Lynn and Jim throughout their more than four years of raising her children, sometimes twenty to thirty calls in one hour; at one point, the family stayed outside the home overnight because they feared for their safety.  Before Sarah’s visitation was discontinued in 2000, the children would be frightened and clingy after the visits with her.

By the time of trial, E.V.’s night terrors were occurring only about once a month.  The children were doing pretty well in school and at home.  Lynn and Jim interacted with them appropriately and wanted to adopt them.  The couple showed a respect for the children's biracial heritage.  Lynn and Jim also demonstrated a willingness to reestablish some contact between Sarah and the children in the future, but only if she first gains stability.

Based on the evidence before us and the applicable standards of review, we conclude that the evidence is legally
(footnote: 6) and factually
(footnote: 7) sufficient to support the trial court’s findings that Sarah knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that Sarah engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being.  We overrule Sarah’s first, second, fifth, and sixth points.  Even though Sarah does not challenge the evidence supporting the trial court’s best interest finding, we also note that the evidence supports that finding.
(footnote: 8)  We therefore hold that the evidence is legally and factually sufficient to support the trial court’s order terminating Sarah’s parental rights.  Because of our disposition of Sarah’s first, second, fifth, and sixth points, we do not reach her third and fourth points regarding the evidence supporting her failure to support the children.
(footnote: 9)
 Having held that the evidence is legally and factually sufficient to support termination, we affirm the trial court’s order of termination and adoption.

PER CURIAM

PANEL F: DAUPHINOT, HOLMAN, and GARDNER, JJ.

DELIVERED:  August 25, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D), (E), (F) (Vernon 2002).

3:
See id.
 § 161.001(2).

4:
In re W.J.H.
, 111 S.W.3d 707, 715-16 (Tex. App.—Fort Worth 2003, pet. denied) (citations omitted).

5:
In re R.W.
, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) (citations omitted).

6:
See
 
In re J.F.C.
, 96 S.W.3d 256, 265-66 (Tex. 2002).

7:
See
 
In re C.H.
, 89 S.W.3d 17, 25, 28 (Tex. 2002).

8:
See J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25, 27, 28;
 Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).

9:
See
 
Tex. R. App. P.
 47.1; 
W.J.H.
, 111 S.W.3d at 715.